UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEVIN REDD,

                Petitioner,

     - against -

JOHN W. BURGE ET AL.,

                Respondents.

1:06-cv-00096-RJH-KNF

**MEMORANDUM**
**OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

    Kevin Redd, a prisoner in the custody of the State of New York, petitions for a writ of habeas corpus based on his trial counsel's failure to seek suppression of an investigatory lineup under *People v. Coates*, 543 N.E.2d 440 (N.Y. 1989). Before the lineup, at the lineup, and at trial, Errol Medina identified Redd as one of the people who executed his girlfriend and shot him twice in the head.

    On October 10, 2007, Magistrate Judge Kevin Nathaniel Fox issued a Report and Recommendation recommending that Redd's petition be denied. Having undertaken a de novo review of Magistrate Judge Fox's thoughtful report and recommendation, portions of which are incorporated into this Opinion, the Court denies Redd's petition.

## BACKGROUND

    Unless otherwise noted, the following is undisputed.

### I.    The Underlying Offense

    On the evening of April 30, 1992, Janine Barksdale was at home in her apartment in the Bronx. (*See* Pet.'s Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus 7 ("Pet. Mem.").) Barksdale's two young children, who were about five months and four

years old at the time, were with her.  (*See* Tr. 224-25, 228.[1])  Around 6:00 or 6:30 p.m., Barksdale let a group of three to five people (the exact number is unimportant) into the apartment.  (*See* Pet. Mem. 7-8).  Around 7:30 or 8:00, Nicole Esters arrived.  (*Id.* at 8.)

While Esters was sitting in the living room with the assembled group, someone in the group asked Barksdale "where was the money and the drugs and the guns."  (Pet. Mem. 8 (quoting Tr. 280-82).)  When Barksdale claimed not to know, one person tied her hands behind her back and led her into the baby's bedroom.  (Pet. Mem. 8.)  While Esters watched the children in the living room, the rest of the group ransacked the apartment looking for money, drugs, and guns.  (*See* Tr. 286-87.)

At about 10:00 or 10:30 p.m. Errol Medina, the father of Barksdale's children, arrived.  (Pet. Mem. 9.)  There was a fight, which ended when someone told Medina to stop fighting or his children would be killed.  (Pet. Mem. 9.)  Medina's head was covered with a hood, and he was led into the bedroom.  (*Id.*)  There, someone cut his neck and forced him to lie down.  (*Id.*)  Janine Barksdale, who at some point had been removed to the master bedroom, was brought into the bedroom with Medina.  (Tr. 410.)

Medina described what happened next.

> Q. Were you able to have a conversation with Janine at that point?
>
> A. Yeah.
>
> Q. What did that conversation consist of?
>
> A. She said, we all going to die, and she started crying and I told her something like, it will be all right, and I loved her and that was it.
>
> * * *

---

[1] References to "Tr." are to the trial minutes, available in the Clerk of Court's case file.

> Q. Now after this conversation, could you hear anything else going on in the apartment at that point?
>
> A. I heard the music go up, and I heard a [gun's] slide click and chamber a round.
>
> * * *
>
> Q. At that point, after you heard the slide clicking, what happened next?
>
> A. Then I heard two shots go off, then somebody else came up to me, put a gun to my head, you know, I was like, just give a [sic] me a little second so I can say a prayer, make my peace, whatever, and I got shot twice in the head.

Tr. 411-13.  Medina survived the shooting, pretended to be dead, and eventually took an ambulance to the hospital.  (Pet. Mem. 10.)

Both Medina and Nicole Esters testified at trial that Kevin Redd was one of the men present in Barksdale's apartment.  (*See, e.g.*, Tr. 279 (Esters); Tr. 426 (Medina).)  In particular, Esters testified that shortly before hearing shots, she saw Redd standing over Barksdale's body holding a gun to her head, which had been covered by a pillow.  (Tr. 307.)

**II.     The Lineup**

On July 17, 1992, Redd's girlfriend Anna Roque told him that police officers investigating Barksdale's death were looking for him.  (*See* Tr. 1053-54).  Three days later, Redd contacted his parole officer and told him that the police were looking for him. (*See id.* at 1057.)  The parole officer asked Redd if he would like to come to his office, but Redd said he would see him on his next scheduled visit date, July 23, 1992.  (*Id.* at 1057-58.)

On July 23, 1992, Redd hired Kenneth E. Ramseur, Esq. to represent him (Pet. Mem. 4.)  Ramseur called a detective investigating Barksdale's death and told him that

Redd should not be questioned outside his presence.  (*See* Pet. Mem. 4; Aff. of Kenneth E. Ramseur, Pet. Mem. Ex. A; Tr. 1059-62.)  Under New York law, Redd therefore had a qualified right to counsel at any later in-person lineups.  *People v. Coates*, 543 N.E.2d 440, 442 (N.Y. 1989); *see also People v. Wilson*, 680 N.E.2d 598, 600-01 (N.Y. 1997).

On July 29, 1992, the police showed Medina a photo array.  (Hearings Tr. 103-04; 133-134.[2])  Medina identified Redd as one of the men present in Barksdale's apartment on the night of the killing.  (*Id.* at 105-06.)

The next day, July 30, police arrested Redd when he reported to his parole officer.  (Pet. Mem. 5.)  After the arrest, the police conducted an in-person lineup at the 48th Precinct in the Bronx.  (Hearings Tr. 108-09.)  Although Redd told the police he wanted his attorney present, Ramseur did not attend the lineup.  (Redd. Aff. ¶ 2, Ex. B to Pet. Mem; Wade Tr. 139.)  Medina once again identified Redd as one of the men present in Barksdale's apartment on the night of the killing.  (Wade Tr. 108-09; 114; 133.)  A photograph of the lineup was taken and attached to a "Bronx Homicide Lineup Sheet," which Medina signed.  (*See* Pet. Mem. Ex. C.)

As discussed further below, there is a factual dispute about why Ramseur failed to attend the lineup.

### III.   Conviction and Direct Appeal

On August 19, 1992, Redd was indicted by a grand jury for acting in concert with Esters to commit: (i) second-degree murder; (ii) attempted second-degree murder; (iii) first-degree assault; (iv) second-degree criminal possession of a weapon (three counts);

---

[2] References to "Hearings Tr." are to the minutes of hearings held on Dec. 7, 1995 and January 4, 1995, available in the Clerk of Court's case file.

(v) first-degree robbery (two counts); (vi) first degree burglary (two counts); and (vii) fourth-degree criminal possession of a weapon.[3] (*See* Resp.'s Br., *People v. Redd*, at 3 (N.Y. App. Div. Mar. 2000) (citing indictment number 5850/92).)

At trial, Redd's trial counsel, Joyce Hartsfield, never objected to the introduction of the lineup on the ground that it violated Redd's right to counsel. (*See* 420-26.) On March 20, 1995, Redd was convicted after a jury trial of second-degree felony murder, second-degree attempted murder, and first-degree robbery. (*See* Aff. in Opp. of Jessica Carmela Darpino ¶ 6 ("Darpino Aff.").) He was sentenced as a persistent violent felony offender to two consecutive terms of twenty-five years-to-life imprisonment for the second-degree murder and the second-degree attempted murder convictions, and to a concurrent term of fifteen years-to-life imprisonment for the robbery conviction. (*Id.*)

Redd appealed. Insofar as is relevant here, he argued that his right to counsel under Article I § 6 of the New York Constitution was violated when the police conducted the June 30, 1992 lineup outside his defense counsel's presence notwithstanding their knowledge that he was represented by counsel. (*See* Br. for Def.-Appellant, *People v. Redd*, at 23-28 (N.Y. App. Div. Mar. 2000).) The Appellate Division unanimously affirmed, holding that Redd failed to present a factual record sufficient to permit review of his right-to-counsel claim. *People v. Redd*, 272 A.D.2d 168, 169 (N.Y. App. Div. 2000). Redd sought leave to appeal to the New York Court of Appeals, which was denied on December 20, 2000. *People v. Redd*, 95 N.Y.2d 968 (2000) (Kaye, C.J.).

---

[3] Two other charges, first-degree criminal use of a firearm and seventh-degree criminal possession of a controlled substance were dismissed on Redd's motion.

**IV.     Section 440.10 Proceeding**

On March 7, 2002, Redd filed a motion in the trial court to vacate his judgment of conviction under New York Criminal Procedure Law § 440.10.  Redd claimed that he was denied effective assistance of counsel when his trial counsel failed to seek suppression of the July 30, 1992 lineup.  (Darpino Aff. Ex. 5, at 3, ¶ 5.)

In support of this claim, Redd submitted an affidavit signed by himself and an affirmation signed by Kenneth E. Ramseur.  In his affidavit, Redd stated that he told the police he wanted an attorney at the lineup, and that police never told him whether they attempted to contact Ramseur.  (*See* Pet. Mem. Ex. B ¶¶ 2-4.)  For his part, Ramseur stated that he did not remember if he received a call from the police before Redd's lineup, and that he did not remember Joyce Hartsfield contacting him to discuss the case.  (*See* Pet. Mem. Ex. A ¶¶ 3-4.)

The state court rejected Redd's claim.  It first reasoned that a motion to suppress likely would not have succeeded because the available evidence strongly indicated that Ramseur was in fact contacted some eight hours before the lineup.  *See People v. Redd*, Ind. No. 5850/95, at 5-6 (N.Y. Sup. Ct. July 15, 2005), Ex. E. to Pet. Mem. ("State Op."). Since New York law required only a "reasonable opportunity" for Ramseur to attend the lineup, *see, e.g.*, *People v. Snead*, 302 A.D.2d 268 (N.Y. App. Div. 2003), "[t]he most likely explanation for [Ramseur's] absence . . . is not lack of notification but lack of availability."  State Op. 7.  A motion to suppress was therefore weak, and likely would have failed.

Alternatively, the court found that even if Redd's right to counsel at the lineup was violated, Hartsfield's inaction reflected either a legitimate strategic choice or harmless error.  Since Redd and Medina knew one another before the murder,

- 6 -

misidentification was not a plausible defense and Hartsfield's failure to suppress the results of the lineup would have had little or no effect on the jury's deliberations and verdict.  State Op. 8.  *See generally Chapman v. California*, 386 U.S. 18, 24 (1967) (harmless error); *United States v. Wade*, 388 U.S. 318, 242 (1967) ("independent source" rule under federal law for in-court identification following illegal lineup).  The court also noted that other evidence of Redd's guilt, which it characterized as "overwhelming and compelling," was sufficient to convict Redd.  *Id.*

## V.	Federal Proceedings

On January 1, 2006, Redd filed a petition for habeas corpus in this Court.  In his federal petition, Redd once again claims that his right to effective assistance of counsel was violated when Hartsfield failed to seek suppression of the July 30, 1992 lineup.  As noted, Magistrate Judge Fox recommended on October 10, 2007 that the petition be denied.  On October 22, 2007, Redd filed a timely objection to the Magistrate Judge's recommendation.

## DISCUSSION

The Court reviews de novo Magistrate Judge Fox's determination that Redd's ineffective assistance of counsel claim is without merit.  *See* 28 U.S.C. § 636(b)(1).

To prevail on this claim, Redd must show that (1) Hartsfield's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

Because the state court previously adjudicated the claim on the merits, *see Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001), Redd must show not only that his right to

- 7 -

effective assistance of counsel was violated, but that "the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cox v. Donnelly*, 387 F.3d 193, 197 (2d Cir. 2004) (alteration in original); *accord Hemstreet v. Greiner*, 491 F.3d 84, 89 (2d Cir. 2007). *See generally* 28 U.S.C. § 2254(d). In addition, the state court's findings of fact are entitled to a "presumption of correctness" that may only be overcome by clear and convincing evidence. § 2254(e)(1). Since Redd has not demonstrated that the state court's application of *Strickland* was unreasonable or that its factual findings were incorrect, his petition must be denied.

### I.  Performance of Counsel

Redd first argues that the state court relied on an erroneous factual premise in concluding that Hartsfield's representation satisfied the first prong of *Strickland*. Specifically, Redd denies that Ramseur was notified of the lineup, and therefore claims that a motion to suppress would likely have succeeded and should have been made. *See* Pet. Mem. 28.

The evidence cited by Redd, however, does not support revisiting the state court's finding, much less finding that Ramseur was not notified of the lineup. In finding that Ramseur was notified, the state court relied on two pieces of documentary evidence. First, a homicide lineup sheet dated July 30, 1992 tends to show that Ramseur was notified of the lineup at 10:00 a.m. *See* Pet. Mem. Ex. C. And second, an "On-Line Booking System Arrest Worksheet" of the same date shows that Redd made a phone call to Ramseur at 1:15 p.m. *See* Darpino Aff. Ex. 11. Although terse—and unquestionably subject to multiple interpretations—this evidence was enough to support the state court's conclusion that Ramseur was notified of the lineup.

The evidence was also sufficient to support the state court's finding that Ramseur was given "reasonable" notice of the lineup. A 10:00 a.m. notification would have given Ramseur eight hours advance notice of the lineup, and a 1:15 p.m. notification would have given him about five hours advance notice. Under New York law, this was enough. *See Coates*, 543 N.E.2d at 442 (right to counsel requires *opportunity* for counsel to appear); *People v. Snead*, 302 A.D.2d 268, 269 (N.Y. App. Div. 2003) ("[E]ven if we were to conclude that the right to counsel attached, we would find that the attorney received sufficient notice and a reasonable opportunity to attend the lineup." (citations omitted)); *People v. Jones*, 275 A.D.2d 686, 687 (N.Y. App. Div. 2000) ("Since the assigned attorney was given adequate notice of the investigatory lineup and a reasonable opportunity to attend, but declined to do so, the prosecution was entitled to conduct the lineup in counsel's absence." (citations omitted)).

Redd's arguments to the contrary, which largely repeat those made in his § 440.10 proceeding, are unpersuasive. Redd claims that the "asserted lack of recollection" in Ramseur's affidavit establishes "to a high degree of probability" that he was not notified of the lineup. Pet. Mem. 28. But as the state court accurately noted, the affirmation is a study in ambiguity. Ramseur "affirms only that he cannot recall whether he received such a communication," and "qualifies his attendance on his having 'been available . . . .'" State Op. 6. While the evidence the state court relied on was concededly subject to differing interpretations, this Court has difficulty assigning any probative value to Ramseur's statement that he does not recall receiving a call from the police. This is so even though "the honest way to establish the non-occurrence of an event is to assert a lack of recollection of that event." Pet.'s Objs. to Mag. J.'s Report & Rec. 6-7.

Relying on the missing witness rule, Redd also claims that the state's failure to obtain an affidavit from the detective who conducted the lineup in the § 440.10 proceeding "support[s] an inference that his information would be adverse to [the state's] position." Pet. Mem. 21. But by the time of the § 440.10 proceeding, close to ten years had passed since the original lineup. In these circumstances—where the state could reasonably have expected that the detective would not recall who if anyone he notified of the lineup—the state's decision to rely exclusively on documentary evidence should not count against it.

In any event, it is blackletter law that the missing witness rule only allows the factfinder "to give the strongest weight to the evidence already in the case in favor of the other side," and not to "base its verdict on what it speculates the absent witnesses would have testified to, in the absence of some direct evidence." *Felice v. Long Island R. Co.*, 426 F.2d 192, 195 n.2 (2d Cir. 1970) (Friendly, J.). Here, the *only* evidence of the police's failure to call Ramseur is Ramseur's affirmation. And for reasons already discussed, that affirmation proves very little at all.

The Court thus finds no basis to disturb the state court's conclusion that a motion to suppress would have lacked merit, much less a basis for saying that the presumption of correctness has been overcome. It follows that Hartsfield's failure to bring the motion did not violate the first prong of *Strickland*. *Cf. Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is *meritorious* and that there is a reasonable probability

that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." (emphasis added)).

## II.     Prejudice

Even were this Court to find that the factual findings were erroneous, the state court's alternative prejudice holding was not an unreasonable application of *Strickland*.[4]

### A.     Factual Disputes Concerning Medina's Familiarity with Redd

Redd denies that Medina was familiar with him, and claims that as a result, Medina's identification of him at the lineup was critical to the prosecution.  *See* Pet. Mem. 29.  Leaving to the side the fact that Medina first identified Redd in a photo lineup where the state right to counsel did not apply, there is no basis to disturb the state court's finding that Medina was familiar with Redd before the murder.

In reaching that conclusion, the state court was required to resolve conflicting trial testimony.  While Redd testified that he and Medina were acquainted with one another, Medina at one point suggested that he did not know Redd before the murder.  (*Compare* Tr. 1073 *with* Tr. 476.)  Despite this discrepancy, Redd's testimony provided ample support for the state court's finding.  As the court noted, Redd's girlfriend, Anna Roque, lived in the building where the shootings took place.  State Op. 7; *see* Tr. 1006.  Redd often visited Barksdale there, and he saw Medina in Barksdale's apartment and around the building.  State Op. 7; *see* Tr. 1009-10.  Redd testified at trial that he and Medina encountered one another fifteen or sixteen times, and "maybe more."  State Op. 7; Tr.

---

[4] Although the Court need not consider this argument in view of its conclusion above, *see United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994), it does so here out of an excess of caution.

1010.[5]  In view of this testimony, the state court's finding that Medina knew Redd was well supported by the record.

Redd argues that "Medina claimed unequivocally that he did not know any of the perpetrators who were involved in the shooting," but the testimony he cites is hardly the unequivocal admission he claims.  *See* Pet. Mem. 29 (citing Tr. 476).  Read in context, Medina's testimony shows at best that Medina once told someone that he did not know Redd.[6]  Redd also notes that in opposing his § 440.10 motion, the state argued that

---

[5] In addition to the testimony quoted by the state court, Redd testified as follows concerning his relationship with Medina:

> Q.   You know a man named Errol Medina?
>
> A.   Yes.
>
> Q.   How long have you know Errol Medina?
>
> A.   I would say at least six months.  Prior to my—prior to my arrest.
>
> Q.   Prior to your arrest, let us say which was July of '92, so let us say around *January of '92* you met Errol Medina, more or less?
>
> A.   Yes, somewhere around there.

Tr. 1073 (emphasis added).

[6] The cited testimony appears at the end of a line of questions from petitioner's trial counsel about Janine Barksdale's brother Kirk.  After counsel elicited from Medina that he did not know any of Janine's other friends or relatives, the following exchange occurred:

> Q.   Did there ever come a time that you told Kirk Span that you did not know any of the individuals that had shot you?
>
> A.   *I believe so.  Maybe if I spoke to him on it, because at that point in time I didn't.*
>
> Q.   And when you said that you did not know any of the individuals, am I also accurate in stating that at the time you were shot, the very day you were shot, April 30th when you went to Pathmark store, you told the people at the Pathmark store [you had] been shot by Tracy, Janine's cousin?
>
> A.   Nah, I don't exactly remember that.

[continued…]

Hartsfield "effectively attacked" Medina's ability to identify defendants. Pet. Mem. 29 (citing Aff. in Opp. to C.P.L. § 440.10 Mot. ¶ 8, Ex. 6 to Darpino Aff.)  But the state's arguments in the § 440.10 motion were just that.  Nowhere did the state maintain that, as a factual matter, Medina did not know Redd.

Finally, Redd accuses the state judge of taking inconsistent positions, noting that at the charging conference he admitted to "'doubts [about] whether Medina did in fact know' Mr. Redd . . . ."  Pet. Mem. 29 (quoting Tr. 1130).  Those comments, however, also suggest that the judge had not yet fully considered the testimony elicited at trial at the charging conference.  (*See* Tr. 1130 ("The thrust of Mr. Medina's testimony is that he is a stranger, am I correct?").)  And in any event, nothing in the judge's earlier comments precluded the state court from later revisiting the question of whether Medina knew Redd.

The Court accordingly can identify no reason to disturb the state court's finding that Medina and Redd were acquainted with one another, much less to hold that factual finding objectively unreasonable.

## B.     Effect of the Lineup Testimony

Redd's claim that suppression of the lineup identification would have affected the outcome of the trial is also without merit.  As the state court noted, misidentification was

---

   * * *
  Q. And you are saying now that you did not tell them that information?
  A. I am saying I don't remember is what I'm saying.
Tr. 476-77 (emphasis added).

- 13 -

not a plausible defense. *See* State Op. 7. While Redd's counsel mentioned the possibility of misidentification in her summation, her principal argument was that Medina was lying, and the lineup had little relevance to that argument. (*See* Tr. 1150-51.)

The state court's conclusion that, in view of other evidence of Redd's guilt, suppressing the lineup would have had no bearing on the jury's deliberation and verdict was also reasonable. In addition to Medina, three witnesses placed Redd in Barksdale's apartment. Nicole Esters, an eye witness and an accomplice to the robbery and murder, testified in detail as to Redd's role. (*See* Tr. 276 *et seq.*) Tyrone Watson testified that Redd showed him guns from the heist, and that Redd confessed to killing Barksdale. (Tr. 530-31.) And Charles Simmons, a jailhouse informant, testified that Redd confessed to him. (Tr. 820-21.)

While Simmons' testimony might reasonably be questioned and perhaps even ignored, the remaining evidence—viz., Medina's non-lineup testimony and the testimony of Esters and Watson—paints a convincing picture of Redd's guilt. In view of this evidence, which the state court reasonably characterized as "overwhelming and compelling," the Court finds that suppression of the lineup identification would not have had any effect on the jury's verdict. Accordingly, the Court cannot say that the state court's application of *Strickland*'s prejudice prong was unreasonable.

## CONCLUSION

The petition for habeas corpus is denied. As Redd has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. 2253(c)(1). Redd may, however, pursue any further appellate remedies in forma pauperis. The Clerk shall close this case.

Dated: New York, New York
       December 8, 2008

_____
Richard J. Holwell
United States District Judge